**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MARY BETH'S TOWING LLC,     ) | |
|         ) | |
|       Plaintiff,     ) | |
|         ) | |
|     v.     ) | 2:16-cv-00452 |
|         ) | |
| BOROUGH OF BROWNSVILLE,     ) | Chief Judge Joy Flowers Conti |
| STANLEY JABLONSKI, and     ) | |
| LESTER J. WARD,     ) | |
|         ) | |
|       Defendants.     ) | |

## <u>MEMORANDUM OPINION</u>

CONTI, Chief District Judge.

## I.    **INTRODUCTION**

Pending before the court is the October 16, 2017 motion for summary judgment filed by the Borough of Brownsville ("Borough"), Stanley Jablonski ("Chief Jablonski"), and Lester J. Ward ("Mayor Ward") (*collectively*, "defendants"), pursuant to Federal Rule of Civil Procedure 56(a). (ECF No. 54). Defendants seek judgment as a matter of law with respect to all claims contained in the second amended complaint filed by Mary Beth's Towing, LLC ("plaintiff") on January 6, 2017. (ECF No. 34). In Counts I and II of the second amended complaint, plaintiff claims that defendants directed business to a male-owned competitor in violation of the Equal Protection Clause of the Fourteenth Amendment.[1] This court exercises subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction). For the reasons that follow, defendants' motion will be GRANTED.

---

[1]     In its response to the instant motion, plaintiff voluntarily withdrew any claim against the defendants for intentional infliction of emotional distress, to the extent that claim was asserted in the second amended complaint. (ECF No. 60 at 14). Plaintiff also withdrew its claim for municipal liability against Chief Jablonski. (*Id.* at 11 n.5).

## II.  FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff is a Pennsylvania-registered limited liability company owned solely by Mary Beth Stanislaw ("Stanislaw").  (Combined Concise Statement of Material Facts (ECF No. 65) ("C.S.") ¶ 1).  Stanislaw organized plaintiff in or about January 2012, and plaintiff conducts regular business in Fayette County, Pennsylvania.  (C.S. ¶ 53).  Plaintiff was physically located in Fairbank, Pennsylvania, until relocating to Cardale, Pennsylvania – approximately 1.5 miles closer to the Borough, but still several miles away.  (C.S. ¶ 54; ECF No. 62-1 at 4).  Stanislaw runs the business with the help of her husband, as well as her son and mother.  (C.S. ¶¶ 8 – 11).  While plaintiff provides some remuneration for the Stanislaw family members' services, it does not employ regular staff.  (C.S. ¶¶ 6, 9, 11).

On or about January 29, 2013, Stanislaw presented the Borough with all documentation necessary for plaintiff's inclusion in the Borough's towing rotation, including licenses and proof of insurance.  (C.S. ¶ 55).  Stanislaw called attention to her status as "one of the few licensed female salvors in PA."  (C.S. ¶¶ 55 – 56).  On or about February 12 and March 12, 2013, Stanislaw appeared before the Borough council to request plaintiff's inclusion in the towing rotation.  (C.S. ¶¶ 57, 59).  Following these meetings, the Borough council deemed plaintiff qualified to provide towing services for the Borough.  (C.S. ¶¶ 44, 62).  Stanislaw received a letter from the Borough on April 11, 2013, confirming that plaintiff was on its "towing rotation."  (C.S. ¶¶ 14, 61; ECF No. 54-4).  Plaintiff has remained an approved tower since it was added to the towing rotation in 2013.[2]  (C.S. ¶ 62).

---

[2]  Plaintiff is approved to receive referrals for its towing services from a number of other southwestern Pennsylvania communities.  (C.S. ¶ 12).  These include: Belle Vernon, Uniontown, Redstone Township, Luzerne Township, and German Township.  (ECF No. 62-1 at 4).  Plaintiff is also an approved tower for the Pennsylvania State Police.  (ECF No. 62-1 at 4).

With respect to utilization of approved towers, it is Borough policy[3] for police officers responding to a disabled vehicle to first ensure that the vehicle is not a hazard, and if so, to arrange for it to be immediately moved. (C.S. ¶ 20; ECF No. 54-9 at 1). A responding officer, however, when it is feasible should attempt to ascertain ownership of the car and determine the owner's towing preference. (C.S. ¶ 21; ECF No. 54-9 at 1). If the owner has no preference or is unresponsive, the vehicle is abandoned, or the situation is such that the vehicle must be removed without first consulting the owner, the towing regulations direct that an approved tower must be chosen by Borough police per the "rotation procedure." (ECF No. 54-9 at 1). "Rotation procedure" is not defined. (ECF No. 54-9 at 1). Mayor Ward[4] and Chief Jablonski[5] both testified that when circumstances require a Borough police officer to choose an approved tower to remove a vehicle, the procedure has always been for the responding officer to call the closest approved tower. (ECF Nos. 62-4 at 14 – 15; 62-5 at 12). Stanislaw was not provided with a copy of that policy, or informed about this process, when plaintiff became an approved tower for the Borough. (ECF No. 62-1 at 5).

The Borough does not have a full-time police force; the Pennsylvania State Police ("State Police") respond to emergency calls within the Borough at certain times of the day. (C.S. ¶ 13). During those times, the State Police are not bound by the Borough's list of approved towers. (C.S. ¶ 13). The State Police have referred business to plaintiff. (C.S. ¶ 13). From the time of its addition to the Borough's rotation, plaintiff received only one referral from the Borough

---

[3]     The Borough's towing regulations were effective as of April 9, 2002. (ECF No. 54-9 at 1). Stanislaw's husband signed an affidavit claiming that he was informed by Borough councilman James Lawver that the Borough council never officially adopted these regulations. (ECF No. 62-22).

[4]     Mayor Ward assumed his position with the Borough in 2010. (ECF No. 62-5 at 5).

[5]     Chief Jablonski assumed his position with the Borough in 2011, although he had worked for the Borough police for some unidentified period of time prior to his promotion to chief. (ECF No. 62-4 at 6 – 7).

police department.  (C.S. ¶¶ 15, 38, 63).  Based on the most up-to-date towing logs,[6] that single

referral was in 2013.  (ECF No. 62-13 at 7).  That same year, VanDivner Towing ("VanDivner")

received 44 calls.  (ECF No. 62-13 at 7).  VanDivner received 32 calls in both 2014 and 2015.

(ECF No. 62-13 at 8 – 9).  Plaintiff received none.

On or about February 10, 2015, Stanislaw and her husband appeared at a Borough

council meeting to protest the Borough's failure to utilize her services to any significant degree.

(C.S. ¶ 67).  Mayor Ward explained to Stanislaw that she "was on the rotation list," but "the way

it is put in effect is that they usually call the local people and if they are not available then they

call the secondary."  (ECF No. 62-11 at 2).  He stated that, to the extent a vehicle owner

specifically requests plaintiff, and plaintiff can respond in a certain amount of time, plaintiff

should be used.  (ECF No. 62-11 at 2).  Regardless, Mayor Ward was not sure why plaintiff had

not been used more than once to that point, and an investigation into the matter was to be

initiated.  (ECF No. 62-11 at 2).

Mayor Ward and Chief Jablonski met to discuss the Borough's towing policy.  (C.S. ¶

70; ECF No. 62-5 at 43).  Mayor Ward discovered that "there was nothing in red, white and blue

that said they had to go by one, two, three, four, five.  Just safety."  (ECF No. 62-5 at 9).  Chief

Jablonski explained that the salvors approved for towing purposes had never before been put in

writing; accordingly, he and Mayor Ward wished to clarify which salvors were approved, and

under what circumstances each was to be contacted pursuant to the "rotation procedure."  (ECF

No. 62-4 at 23, 32, 41).  A letter was drafted by Chief Jablonski identifying VanDivner as the

Borough's "primary" tower, and plaintiff as a "secondary" tower.  (C.S. ¶ 76).  Weld Towing

---

[6]     At the direction of Mayor Ward, the Borough police created an official towing log after Stanislaw began to file right-to-know requests regarding the police department's utilization of the various Borough-approved towers. (ECF No. 62-4 at 29).

was identified as an approved tower for heavy equipment and tractor trailer removal. (ECF Nos. 54-7 at 4; 54-9 at 2). The Borough did not include any other companies in its list of approved towers. The letter was ultimately circulated within the Borough's police department on or about August 28, 2015. (C.S. ¶ 77; ECF No. 62-7 at 2).

Mayor Ward and Chief Jablonski asserted that the primary and secondary classifications were based upon VanDivner's location in Brownsville.[7] (C.S. ¶ 66; ECF Nos. 54-6 at 4; 54-7 at 3). Due to its proximity to calls coming from the Borough police, VanDivner was considered to be the most efficient option. (ECF Nos. 54-6 at 4; 54-7 at 3). If VanDivner could not respond quickly enough, only then would plaintiff be contacted due to its location outside the Brownsville area and presumably slower response time. (C.S. ¶ 36; ECF Nos. 54-6 at 4 – 5; 54-7 at 4). Although these classifications had never been formally memorialized prior to 2015, Mayor Ward would later testify that VanDivner's had always been treated as the *de facto* primary tower[8] by Borough council and Borough police because of VanDivner's location in the Brownsville area. (ECF No. 62-5 at 8 – 11). Chief Jablonski was not aware of when he learned that VanDivner's was considered the primary tower for the Borough, except that it was sometime

---

[7]    VanDivner Towing is not located in the Borough of Brownsville, but in Brownsville Township, adjacent to the Borough. (ECF No. 62-19 at 9).

[8]    Borough police officer John Brant testified that when he first started working for the Borough in 2008, there were three approved towers: Koonava's, VanDivner's, and Joe's Auto. (ECF No. 62-6 at 5). Officers had discretion to call any of the three for towing. (ECF No. 62-6 at 5 – 8). Yet, over time the Borough police only used VanDivner's services, because Koonava's was not consistently available, and Joe's Auto took too long to respond. (ECF No. 62-6 at 5). Joseph Ciarrocchi, owner of Joe's Auto, corroborated that he was slower to respond than VanDivner; although he claimed that he was not an approved tower for the Borough – despite having applied. (ECF No. 62-10 at 5, 9 – 10). Officer Brant was not aware that plaintiff was an approved tower until he received a copy of the letter drafted by Mayor Ward and Chief Jablonski in 2015 outlining towing classifications. (ECF No. 62-6 at 6, 11). He was also unaware that VanDivner was officially the "primary" tower prior to receipt of the letter. (ECF No. 62-6 at 13). Based upon his experience working for both the Borough and neighboring Redstone Township, Officer Brant recalled that VanDivner typically took ten to fifteen minutes to reach a scene, whereas plaintiff took – on average – twenty minutes. (ECF No. 62-6 at 4, 9).

prior to 2015.[9] (ECF No. 62-4 at 34). Similarly, he was not entirely certain of when he learned about plaintiff's secondary status.[10] (ECF No. 62-4 at 33 – 34). Robert VanDivner, owner of VanDivner's Towing, was never told that he was the Borough's "primary" tower. (ECF No. 62-19 at 12).

Stanislaw was likewise never informed that the Borough considered her business to be a "secondary source;" she had not seen a Borough policy identifying her that way. (C.S. ¶ 9; ECF No. 62-1 at 14). There is no Borough policy that dictates a tower must respond to a call within a certain timeframe. (C.S. ¶ 82). Stanislaw asserts that plaintiff can respond to a call in the Borough in as little as seven or eight minutes, and there was no prior indication that plaintiff was not capable of responding to calls in what the Borough considers to be a timely manner. (C.S. ¶ 83; ECF Nos. 54-3 at 11; 54-6 at 5). Records show that VanDivner Towing generally responded to calls within eight to fifteen minutes. (C.S. ¶ 86).

Plaintiff filed an initial complaint in this court on April 15, 2016. (ECF No. 1). The operative second amended complaint followed on January 6, 2017. (ECF No. 34). Plaintiff argues that the Equal Protection Clause of the Fourteenth Amendment was violated due to both sex-based discrimination in utilization of approved towers, as well as plaintiff's status as a "class of one" subject to irrational and arbitrary treatment by the Borough. Defendants filed the present

---

[9]     Sometime after the February 10, 2015 Borough council meeting, Stanislaw's husband went to the Borough police department to ask Chief Jablonski why plaintiff was not being utilized by the Borough. (ECF No. 62-2 at 8). In an exchange that Stanislaw's husband described as "a little bit heated," Chief Jablonski allegedly declared that "VanDivner does all his towing," and that plaintiff "didn't need the tow." (ECF No. 62-2 at 8). In response to the accusation by Stanislaw's husband that his wife's civil rights were being violated, Chief Jablonski purportedly said to "sue him." (ECF No. 62-2 at 8).

[10]    Chief Jablonski testified that Mayor Ward instructed him to classify plaintiff as the secondary tower, but he could not recall when he was first informed of this classification, noting that it could have been at any time between 2013 and 2015. (ECF No. 62-4 at 23, 33 – 34). He added that information about approved towers "goes through council, to the mayor, to me, and I spread it out to the other officers." (*Id.* at 12).

motion for summary judgment on October 16, 2017. (ECF No. 54). The matter was fully briefed as of January 12, 2018, and is ripe for disposition. (ECF Nos. 55 – 56, 60 – 65).

## III.   STANDARD OF REVIEW

A grant of summary judgment is appropriate when the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Heffernan v. City of Paterson*, 777 F.3d 147, 151 (3d Cir. 2015) (quoting Fed. R. Civ. P. 56(a)). A genuine issue of material fact is one that could affect the outcome of litigation. *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). However, "'[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.'" *N.A.A.C.P. v. North Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The initial burden is on the moving party to adduce evidence illustrating a lack of genuine issues. *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 – 24 (1986)). Once the moving party satisfies its burden, the nonmoving party must present sufficient evidence of a genuine issue, in rebuttal. *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 587). When considering the parties' arguments, the court is required to view all facts and draw all inferences in the light most favorable to the nonmoving party. *Id.* (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

A well-supported motion for summary judgment will not be defeated where the nonmoving party merely reasserts factual allegations contained in the pleadings. *Betts v. New*

*Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010) (citing *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989)). The nonmoving party must resort to affidavits, depositions, admissions, or interrogatories to demonstrate the existence of a genuine issue. *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 773 (3d Cir. 2013) (citing *Celotex Corp.*, 477 U.S. at 324).

## IV.  DISCUSSION

### A.  Fourteenth Amendment Claims

Plaintiff's claims in Counts I and II of the second amended complaint are asserted pursuant to 42 U.S.C. § 1983, which provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law….

Section 1983 serves as a means of vindicating violations of federal constitutional and statutory rights. *Groman v. Twp. of Manalapan*, 47 F.3d 628, 633 (3d Cir. 1995). In order to state a valid § 1983 claim, a plaintiff must demonstrate that a person acting under color of law violated enumerated constitutional or statutory rights. *Berg v. Cnty. of Allegheny*, 219 F.3d 261, 268 (3d Cir. 2000). When the constitutional provision allegedly violated is the Equal Protection Clause of the Fourteenth Amendment, a plaintiff must also demonstrate: (1) his or her "membership in a suspect class," or "the exercise of a fundamental right;" or (2) that he or she was "treated differently from similarly-situated others and that this differential treatment was not rationally related to a legitimate state interest." *Young v. New Sewickley Twp.*, 160 F.App'x 263, 266 (3d Cir. 2005) (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985)).

### 1.  Count I: Sex Discrimination

At Count I of the second amended complaint, plaintiff pleads a claim for gender-based discrimination under the Equal Protection Clause. In order to establish that claim, plaintiff must demonstrate "(1) disparate treatment in relation to other similarly situated individuals, and (2) that the discriminatory treatment was based on sex." *Johnston v. Univ. of Pittsburgh of Commw. Sys. of Higher Educ.*, 97 F.Supp.3d 657, 667 (W.D. Pa. 2015) (citing *Andrews v. City of Phila.*, 895 F.2d 1469, 1478 (3d Cir. 1990)). In order to be similarly situated, parties must be "alike 'in all relevant aspects,'" *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 273 (3d Cir. 2014) (quoting *Startzell v. City of Phila.*, 533 F.3d 183, 203 (3d Cir. 2008)), and discriminatory treatment must be purposeful. *Blunt*, 767 F.3d at 273; *Johnston*, 97 F.Supp.3d at 667.

Defendants argue that plaintiff failed to adduce evidence of either of those elements, and that they are entitled to judgment as a matter of law. (ECF No. 55 at 7 – 10). With respect to establishing the disparate treatment element, defendants contend that the party most similarly situated to plaintiff is Joe's Auto, due to the distance of Joe's Auto from the Borough, and because Joe's Auto was similarly underutilized by the Borough. (ECF No. 55 at 7). As Joe's Auto is owned by a male, defendants believe that plaintiff cannot establish disparate treatment.

Whether plaintiff and Joe's Auto are a similar distance from the Borough is not entirely clear in the record. Stanislaw's husband testified that his wife and he live about a quarter-mile from Joe's Auto, and their properties connect. (ECF No. 62-12 at 4). Mr. Ciarrocchi testified that Joe's Auto and plaintiff were located one mile apart. (ECF No. 62-10 at 10). Stanislaw testified that her business, in Cardale, is approximately one and one-half miles away from her residence in Fairbank. (ECF No. 62-1 at 3 – 4). Whether plaintiff and Joe's Auto are sufficiently close to be considered similarly situated is uncertain. Regardless, the court concludes that plaintiff and Joe's Auto cannot be similarly situated due to a more definitive

characteristic: Joe's Auto was not an approved tower for the Borough during the relevant time period. Accordingly, his treatment by the Borough would necessarily be different from approved towers.

Like plaintiff, VanDivner and Weld are both approved towers. VanDivner is most similarly situated to plaintiff because it does not handle heavy equipment or tractor trailers. Weld is the only one of the approved towers utilized for this – and only this – purpose. As explained by both Mayor Ward and Chief Jablonski, and as outlined in Chief Jablonski's August 2015 letter, VanDivner and plaintiff are alternate options for handling the same types of day-to-day towing scenarios, and thus are most similarly situated.

Defendants argue, however, that VanDivner cannot be considered a similarly situated individual due to its business being located in the Brownsville area, and plaintiff's being located several miles out. The court notes that "comparators must be alike, but not identical, in all relevant respects." *Kahan v. Slippery Rock Univ. of Pa.*, 50 F.Supp.3d 667, 389 (W.D. Pa. 2014) (citing *Mun. Revenue Serv., Inc. v. McBlain*, 347 F.App'x 817, 825 (3d Cir. 2009)); *see Borrell v. Bloomsburg Univ.*, 955 F.Supp.2d 390, 405 (M.D. Pa. 2013) (quoting *Southersby Dev. Corp. v. Borough of Jefferson Hills*, 852 F.Supp.2d 616, 628 (W.D. Pa. 2012)) ("'[T]he law in the Third Circuit does not require the plaintiff to show that the comparators are identical in all relevant aspects but only that they are alike.'").

With respect to similarities between plaintiff and VanDivner, the record reveals: a) no differences in the approval process for plaintiff and VanDivner; b) the expected services to be performed if called upon by the Borough were the same for both plaintiff and VanDivner; and, c) plaintiff and VanDivner were on the same towing rotation/list and were never informed that they were categorized as "primary" and "secondary" towers. The record also contains evidence that

plaintiff and VanDivner have comparable response times. Stanislaw testified that plaintiff can respond to calls in as few as seven or eight minutes, and other evidence shows that VanDivner's response times ranged from eight to fifteen minutes.

What is not clear in the record is plaintiff's and VanDivner's respective distances from the Borough, and plaintiff provided the court with no evidence with which to assess any similarity in this regard. In light of the nature of plaintiff's claim in Count I, the issue of distance is material. Thus, even when viewed in the light most favorable to plaintiff, the court cannot conclude that plaintiff and VanDivner are alike in all relevant respects. *Kazar v. Slippery Rock Univ. of Pa.*, 679 F.App'x 156, 162 (3d Cir. 2017) (finding parties were not similarly situated when distinguishable in a "critically important respect."). Plaintiff did not advance the names of any other approved towers who may be considered similarly situated for purposes of its Equal Protection Clause claims. The first element of plaintiff's claim at Count I was not, therefore, satisfied.

Even if the court were to find otherwise, defendants also assert that plaintiff failed to satisfy the second element of its claim by providing no evidence that the Borough's failure to utilize plaintiff's services was based on Stanislaw's gender. (ECF No. 55 at 8 – 10). "The *sine qua non* of any successful Equal Protection claim under § 1983 is purposeful discrimination." *Williams v. Pa. State Police Bureau of Liquor Control Enforcement*, 108 F.Supp.2d 460, 471 (E.D. Pa. 2000) (citing *Keenan v. City of Phila.*, 983 F.2d 459, 465 (3d Cir. 1992)). "This is what distinguishes § 1983 equal protection claims from Title VII cases; to prevail on a § 1983 claim, a plaintiff must prove that the defendant intended to discriminate." *Id.* (citing *Washington v. Davis*, 426 U.S. 229, 238 – 39 (1976)).

While a plaintiff may rely upon direct or indirect evidence to establish intent, "the threshold of indirect proof for a *prima facie* case of equal protection violation is higher than in a Title VII case; a § 1983 plaintiff must show disparate impact *plus* some additional 'indicia of purposeful discrimination.'" *Id.* (quoting *Pa. v. Flaherty*, 983 F.2d 1267, 1273 (3d Cir. 1993)); *see Maull v. Div. of State Police, Dep't of Public Safety, State of Del.*, 141 F.Supp.2d 463, 478 n.6 (D. Del. 2001) (finding § 1983 discrimination claims impose a more stringent intent requirement than Title VII); *see also Donahue-Cavlovic v. Borough of Baldwin*, Case No. 15-1649, 2017 WL 4862072, at *11 (W.D. Pa. Oct. 26, 2017) (finding that a plaintiff must also offer proof of intent to discriminate on the basis of sex). "'[I]ntent' for purposes of an equal protection claim means that the [defendants] 'selected or reaffirmed a particular course of action at least in part *because of*, not merely *in spite of*, its adverse effects upon an identifiable group.'" *Alba v. Housing Auth. of City of Pittston*, 400 F.Supp.2d 685, 703 (M.D. Pa. 2005) (quoting *Flaherty*, 983 F.2d at 1273).

Plaintiff clearly demonstrated that defendants' conduct had a disparate impact on its business: during the relevant time period, VanDivner – a male-owned business – received approximately 108 calls from the Borough versus 1 call made to plaintiff – a female-owned business. (ECF No. 60 at 5 – 7). The court must now look for other indicia of purposefulness. Relevant to this inquiry is Officer Brant's testimony that a previous rotation of three towers[11] – including VanDivner – were contacted for towing services at the discretion of Borough officers, and that he was not aware of any official policy guiding the exercise of that discretion. (ECF No. 62-6 at 5 – 8). Officer Brant did not indicate when this rotation first came into existence, only that he was informed of these approved towers when he began working for the Borough in

---

[11] There is no indication that all three towers were male-owned and operated.

2008.[12]  (ECF No. 62-6 at 5 – 6).  Officer Brant testified that, prior to plaintiff's addition to the rotation, VanDivner became the only tower used by the Borough because Koonava's and Joe's Auto proved to be less consistent and slower.  (ECF No. 62-6 at 5).

Significant to the determination of purposefulness is the undisputed fact that the "primary" and "secondary" classification scheme and consideration of towers' proximity were put into writing only after plaintiff's complaints to Borough council.  It is similarly undisputed that towing logs were not implemented until after Stanislaw filed right-to-know requests.  That neither plaintiff nor VanDivner had previously heard of any towing classifications is also pertinent.  Mayor Ward testified that he was unaware that there was any rotation procedure or list of approved towers in writing prior to 2015.

Viewed in the light most favorable to plaintiff, this evidence illustrates only that VanDivner was primarily utilized by the Borough before plaintiff was approved, that there was no process for tracking towing referrals prior to Stanislaw's complaints to Borough council, and that the Borough lacked a clearly-defined rotation procedure prior to August 2015.  Aside from the disparate impact suffered by plaintiff as a result of this disorganization, there is no indicia of *intentional* gender-based discrimination provided by plaintiff.  When asked at her own deposition what reasons Stanislaw had for concluding that the Borough was discriminating against her based upon her gender, Stanislaw replied with, "[w]ell, what else could it be is my question, because I have all the qualifications that they require?"  (ECF No. 62-1 at 21).

A showing of intentional discrimination requires more.  *See Suber v. Wright*, 574 F.App'x 207, 212 (3d Cir. 2014) (granting summary judgment where plaintiff failed to point to "a shred of evidence" reflecting discriminatory intent aside from allegations of selective

---

[12]  Mayor Ward did not begin his tenure with the Borough until 2010, and Chief Jablonski did not assume his position until 2011.

treatment based upon race); *Hargrave v. Ramsey*, Case No. 15-201, 2016 WL 3194531, at *6 (E.D. Pa. June 9, 2016) (finding that indirect evidence of intent must rise above assertion or speculation); *Kagarise v. Christie*, Case No. 9-402, 2013 WL 6191556, at *5 (M.D. Pa. Nov. 26, 2013) (granting summary judgment where no evidence of differential treatment based on sex was produced, and plaintiff admits he does not know why he was differently treated). No rational trier of fact could infer from the above evidence that there was purposeful gender-based discrimination by defendants, especially when plaintiff was approved by the Borough council even after calling attention to its status as one of the few female-owned salvors in Pennsylvania. Accordingly, plaintiff cannot satisfy the second element of its Equal Protection claim for gender discrimination, and defendants are entitled to judgment as a matter of law at Count I of the second amended complaint.

2. Count II: Class of One

At Count II of the second amended complaint, plaintiff asserts another Equal Protection claim as a "class of one." This kind of claim requires plaintiff to show that "'(1) the defendant treated [it] differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment.'" *Thomas v. Coopersmith*, 663 F.App'x 120, 123 (3d Cir. 2016) (quoting *Hill v. Borough of Kutztown*, 455 F.3d 225, 239 (3d Cir. 2006)). Of note is that "the rational basis standard for a 'class of one' claim sets a high hurdle for plaintiffs, requiring a showing of different treatment that is 'irrational and wholly arbitrary.'" *Patterson v. Strippoli*, 639 F.App'x 137, 144–45 (3d Cir. 2016) (quoting *Eichenlaub v. Twp. of Ind.*, 385 F.3d 274, 286 (3d Cir. 2004)). There is a "strong presumption of the defendants' actions' validity" when class of one claims are asserted. *Russell v. City of Phila.*,

428 F.App'x 174, 177 n.2 (3d Cir. 2011) (citing *Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).

Defendants argue that plaintiff cannot satisfy the above elements, and that they are entitled to judgment as a matter of law. (ECF No. 55 at 4 – 8). The evidence of record demonstrates that plaintiff was treated differently than VanDivner by the Borough, but does not show that plaintiff and VanDivner are similarly situated[13]. Nevertheless, the court will analyze the second and third elements of plaintiff's class of one claim as if it had found plaintiff and VanDivner similarly situated.

With respect to the second element, there is some dispute that plaintiff's differential treatment was intentional; e.g., Officer Brant did not know that plaintiff was on the list of approved towers. Yet, defendants admit that plaintiff was not utilized with the same frequency as VanDivner due to plaintiff's distance from the Borough and perceived response time. (ECF No. 55 at 7 – 8). Plaintiff denies that this was the true motivation for its disparate treatment by defendants, and argues that there was no rational reason to distinguish between it and VanDivner, particularly in light of plaintiff's claimed ability to reach the Borough in as little as seven or eight minutes.

Challenges based upon a class of one fail, however, whenever "'there is any reasonably conceivable state of facts that could provide a rational basis for classification.'" *Tucker v. Indus. Liquid Coatings, Inc. v. Borough of East Berlin*, 656 F.App'x 1, 7 (3d Cir. 2016) (quoting *Highway Materials, Inc. v. Whitemarsh Twp.*, 386 F.App'x 251, 259 (3d Cir. 2010); *Heller v. Doe by Doe*, 509 U.S. 312, 320 (1993)). The classifications – and rationale behind them – need

---

[13] Whether a plaintiff has demonstrated that it is similarly situated to another party for purposes of a "class of one" claim is determined under the same standard as for its gender-based discrimination claim. *See Price v. City of Phila.*, 239 F.Supp.3d 876, 899 (E.D. Pa. 2017) (citing *Startzell*, 533 F.3d at 203) (where plaintiff asserted class of one claim that he was treated differently by police than a female engaged in the same disruptive behavior, court found that parties were similarly situated because they were alike in all relevant respects).

not have been articulated by the government at any prior point in time, *Heller*, 509 U.S. at 320, and the rational basis standard "'permits a court to hypothesize interests that *might* support [the governmental] distinctions.'" *Hassan v. City of N.Y.*, 804 F.3d 277, 305 (3d Cir. 2015) (quoting *Heller*, 509 U.S. at 320).

Vital to plaintiff's claim – and this court's analysis of whether there was a rational basis for defendants' distinction between plaintiff and VanDivner – is evidence of "the existence of a clear standard against which departures, even for a single plaintiff, could be readily assessed." *Olech*, 553 U.S. at 602. Viewing the facts of record in the light most favorable to plaintiff, there does not appear to be any "clear standard," given the lack of evidence of a clearly defined rotation procedure. Defendants contend that this is because the determination of which approved towers should be used, and in what order, is a discretionary function. (ECF No. 55 at 5 – 6).

In *Engquist v. Oregon Department of Agriculture*, the Supreme Court reiterated its well-established holding that "there is a crucial difference, with respect to constitutional analysis, between the government exercising 'the power to regulate or license, as lawmaker,' and the government acting as 'proprietor, to manage its internal operation.'" 553 U.S. 591, 598 (2008) (quoting *Cafeteria & Rest. Workers v. McElroy*, 367 U.S. 886, 896 (1961)). When it comes to legislation, all people are expected to be treated alike, under like circumstances. *Id.* at 602. Where state action involves "discretionary decisionmaking based on a vast array of subjective, individualized assessments," this expectation is diminished. *Id.* at 603. "It is no proper challenge to what in its nature is a subjective, individualized decision that it was subjective and individualized." *Id.* at 604. Therefore, when analyzing the basis upon which a defendant treats a plaintiff differently from similarly situated others, courts must be cognizant of whether there

exists a "clear standard," or whether a defendant was simply "exercising discretionary authority based on subjective, individualized determinations." *Id.* at 602.

*Engquist* applied this rationale to the government employment setting. As pointed out by defendants, courts in other circuits have applied this reasoning to the government's treatment of contractors. *See Higgins Electric, Inc. v. O'Fallon Fire Prot. Dist.*, 813 F.3d 1124, 1129 – 30 (8th Cir. 2016); *Douglas Asphalt Co. v. Qore, Inc.*, 541 F.3d 1269, 1274 (11th Cir. 2008). The Court of Appeals for the First Circuit has applied it to a case involving the broad provision of discretionary power to a commission overseeing casino licensing. *Caesars Mass. Mgmt. Co., LLC v. Crosby*, 778 F.3d 327, 336 – 37 (1st Cir. 2015) (citations omitted) ("The possibility of mandating or deriving a baseline against which to assess a [class of one] claim of 'treating seemingly similarly situated individuals differently'…is in fact even further from possibility in casino licensing than in public hiring."). Courts within the Third Circuit have applied it to other situations implicating discretionary decisions. *See Barndt v.Wenerowicz*, 698 F.App'x 673, 676 (3d Cir. 2017) (noting determination to revoke contact visit was within sound discretion of prison administrators); *Perry v. Pa. Dep't of Corr.*, 441 F.App'x 833, 838 (3d Cir. 2011) (citing *Engquist*, 553 U.S. at 603) (suggesting denial of parole could be considered discretionary, and not subject to an Equal Protection claim).

In the present case, defendants argue that in determining the order in which approved towers were to be used, the Borough was simply exercising discretion based on a subjective assessment of the towers' respective abilities to provide efficient service. The court observes that plaintiff never received any guarantee of use, but was only approved to be placed on the Borough's list of towers. There was no evidence presented indicating that plaintiff was provided with a policy which stated that it was entitled to receive calls for towing services from the

Borough police. Stanislaw testified that she was never provided with *any* towing policy. There is no contractual agreement for provision of services. Plaintiff points to no authority restricting how the Borough may determine which towers it uses and under what circumstances. The facts show that there was only ever the *prospect* of receiving calls, where before the Borough's approval, there was none.

Plaintiff failed to furnish evidence of a clear standard upon which to judge the Borough's treatment of plaintiff as opposed to VanDivner. Although Mayor Ward and Chief Jablonski issued a letter in 2015 regarding primary and secondary classifications for approved towers, the court cannot analyze if there was a rational basis for this distinction because plaintiff failed to provide evidence of its distance from the Borough relative to VanDivner's distance. Thus, plaintiff's class of one claim must fail.

### B. Monell

Even if plaintiff did meet the requirements for asserting valid Fourteenth Amendment claims, it would still need to meet the requirements for a municipal claim as outlined in *Monell v. Department of Social Services*, 436 U.S. 658 (1978). In that case, the Supreme Court established that municipal liability cannot be premised on *respondeat superior*; a municipality may be held responsible for torts committed by employees in only one of three ways:

> First, the municipality will be liable if its employee acted pursuant to a formal government policy or a standard operating procedure long accepted within the government entity, *Jett v. Dallas Independent School District*, 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989); second, liability will attach when the individual has policy making authority rendering his or her behavior an act of official government policy, *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); third, the municipality will be liable if an official with authority has ratified the unconstitutional actions of a subordinate, rendering such behavior official for liability purposes, *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988).

*McGreevy v. Stroup*, 413 F.3d 359, 368 (3d Cir. 2005) (citing *Monell*, 436 U.S. at 694).

In its opposition to the instant motion, plaintiff argues that Mayor Ward was an official with final policy-making authority, and that he conceived of, and promulgated, a discriminatory towing policy for the Borough. It is plaintiff's contention that there previously existed a policy whereby Borough-approved towers were called on a rotating basis, but that as the *de facto* head of the Borough police department, Mayor Ward created a new policy dictating that Borough police were to use plaintiff only if VanDivner was unavailable.

Plaintiff provides the court with no evidence of any pre-existing mandatory rotation procedure, or that Mayor Ward influenced towing policy or practice prior to Stanislaw's complaints of differential treatment. Officer Brant testified that when he joined the Borough police department in 2008, Borough police were informed that they could choose from three Borough-approved towers at their discretion – VanDivner, Koonava, and Joe's Auto. (ECF No. 62-6 at 5, 7 – 8). There was no written policy dictating the order in which towers were chosen. (*Id.* at 7). Prior to receiving the written towing procedure from Mayor Ward and Chief Jablonski in August 2015, Officer Brant was unaware that plaintiff was even an approved tower, and primarily used VanDivner's services because it was the most reliable of the former group of approved towers. (*Id.* at 5 – 7). This account is consistent with Mayor Ward's testimony that he could not find a written rotation procedure after Stanislaw brought her concerns before the Borough council. (ECF No. 62-5 at 9). Regardless, whatever the former policy or practice of the Borough police, there is no indication in the evidence of record that Mayor Ward played a role in formulating towing policy prior to 2015.

With respect to the letter issued in August 2015 in response to Stanislaw's complaints, Mayor Ward stated that Chief Jablonski and he met to clarify the previously unwritten rotation procedure, not to create a new policy. (ECF No. 62-5 at 8 – 12). He also indicated that his

understanding of the rotation procedure came from conversations with Borough council, Chief Jablonski, and Borough police officers, and that he was informed by these sources that VanDivner was, up to that point, utilized as the Borough's primary tower. (*Id.* at 9). Mayor Ward disputes that he had any part in creating the Borough's rotation procedure. (*Id.* at 7). Although Chief Jablonski testified that he received information regarding approved towers and procedure from Mayor Ward, he also acknowledged that Mayor Ward received his information from Borough council. (ECF No. 62-4 at 12, 23, 32, 34, 40).

Officials "'whose acts or edicts may fairly be said to represent official policy'" may subject a municipal entity to liability pursuant to *Monell*. *McGreevy*, 413 F.3d at 368 (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986)). Courts must ascertain whether an "'official had final, unreviewable discretion to make a decision or take action,'" in order to find liability. *Id.* at 369 (quoting *Kneipp v. Tedder*, 95 F.3d 1199, 1213 (3d Cir. 1996)). The evidence presented by plaintiff does not clearly identify Mayor Ward as the final policymaker with respect to the rotation procedure. While Chief Jablonski stated that Mayor Ward informed him that VanDivner was the primary tower and plaintiff was the secondary, Mayor Ward indicated that this information was passed down to him by Borough council. Nothing in the record has been provided by plaintiff to refute these statements. Accordingly, plaintiff's claims must fail pursuant to *Monell*.[14]

## V. CONCLUSION

Based upon the foregoing, the court finds that plaintiff failed to adduce sufficient evidence for a reasonable jury to render a verdict on any of the claims asserted in Counts I and II of the second amended complaint. Plaintiff did not adduce sufficient evidence for a reasonable

---

[14]    Defendants also raise an argument in favor of summary judgment pursuant to qualified immunity. (ECF No. 55 at 10 – 15). The court need not address this argument in light of its decision to grant summary judgment in favor of defendants at Counts I and II.

jury to find municipal liability consistent with *Monell*.  Accordingly, defendants' motion for summary judgment will be granted.  (ECF No. 54).

Appropriate orders to follow.

/s/ Joy Flowers Conti
Joy Flowers Conti
Chief United States District Judge

Dated: April 13, 2018
cc/ecf: All counsel of record